IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WHITTENEY GUYTON,<br><br>Defendant. | Case No. 2:23-cr-35 |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States, by the undersigned counsel, hereby submits its trial brief in the above-captioned case.

I. **The Indictment**

On March 22, 2023, the grand jury returned an eleven-count indictment against the defendant, Whitteney Guyton. ECF No. 1. The counts allege violations of three statutes. Count 1 charges the defendant with healthcare fraud, in violation of 18 U.S.C. § 1347. Counts 2 through 9 charge the defendant with false statements related to healthcare matters, in violation of 18 U.S.C. § 1035.[1] The parties have entered into factual stipulations regarding certain elements of these statutes. *See* Ex. 1 (factual stipulations). The indictment concerns Guyton's healthcare fraud scheme, using her company Synergy Health Systems LLC (Synergy), to submit falsified

---

1. Count 8 is omitted in the indictment; consequently, the indictment alleges ten violations of federal law (Counts 1-7, 9-11). In addition, Counts 10 and 11, with leave of the Court, were dismissed, charging the defendant with aggravated identity theft in violation of 18 U.S.C. § 1028A. The government dismissed Count 10 and 11 based on intervening Supreme Court authority, *see United States v. Dubin*, 599 U.S. 110 (2023). Therefore, there are eight remaining counts (Counts 1-7, 9): one for violation of § 1347 (Count 1) and seven for violations of § 1035 (Counts 2-7, 9).

documents to Medicaid for (1) personal care services, (2) respite care services, and (3) mental health skill-building services, from at least June 2016 to October 2019.

    A.    **Stipulated Background on Personal, Respite, and Mental Health Care Services**

The Medicaid program was established by Title 19, Social Security Act of 1965, to provide medical assistance to indigent persons. The United States Department of Health and Human Services and the Commonwealth of Virginia, Department of Medical Assistance Services (DMAS), administer and supervise the administration of the Medicaid program in Virginia, which is called the Virginia Medical Assistance Program (Medicaid). The federal and state governments jointly provide funding for Medicaid. Ex. 1 Stip. 3 ¶ 1 (referred to hereafter by paragraph number). Providers are required to sign a participation agreement, and agree to retain all relevant records that DMAS requires. Additionally, providers sign a provider agreement with DMAS and its contractors agreeing to both adhere to the policies and regulations explained in the Community Mental Health Rehabilitation Services provider manual, and to ensure that all the provider's employees adhere to these same policies and regulations. Ex. 1 ¶ 3.

Healthcare service providers must obtain prior authorization from Medicaid before providing personal care and respite care services to Medicaid recipients. Ex. 1 ¶ 4. A Medicaid contractor named Keystone Peer Review Organization (KePRO), or another appropriate managed care organization (MCO) within a state-run Medicaid managed long-term services and support program named Commonwealth Coordinated Care (CCC), reviews authorization requests for personal care services and respite care services to ensure, among other things, that the services are medically necessary and allowable under applicable Medicaid regulations. Ex. 1 ¶ 5.

For a home healthcare service provider to be eligible for reimbursement for personal care and respite care services, the provider must receive a copy of a valid Long-term Services and

Supports (LTSS) Screening, inclusive of a Uniform Assessment Instrument (UAI) for the Medicaid recipient. The LTSS is obtained from an authorized screening team such as the local Department of Social Services or an acute care hospital. UAIs must be completed by a qualified assessor. A Registered Nurse (RN) must also make a Community-Based Care Assessment (DMAS-99) and a Plan of Care (DMAS 97 A/B) of the recipient to determine the eligible number of personal care service hours and respite care eligibility. The home healthcare service provider then submits the screening, including the UAI and assessment by the RN, to KePRO or the appropriate MCO for review and authorization. The home healthcare service provider must receive approval from KePRO or the MCO before they can be paid for personal care and respite care services provided to Medicaid recipients. Ex. 1 ¶ 6

Regarding mental health services, Magellan of Virginia (Magellan) was the behavioral health services administrator for DMAS. It reviews authorizations for mental health skill-building services for individuals with Medicaid that are not enrolled in managed care. Additionally, certain MCOs also review authorizations for mental-health services for individuals enrolled in Medicaid managed care. Medicaid, through its contractors, reviews authorization requests to ensure the services are medically necessary and allowable under applicable Medicaid regulations. Ex. 1 ¶ 7.

For a mental healthcare service provider to be eligible for reimbursement, a Comprehensive Needs Assessment must be completed to gather the clinical data and diagnosis to ensure the recipient meets the medical-necessity criteria. A Service Authorization Request (SAR) is completed after the Comprehensive Needs Assessment because it is based on the information collected in the assessment. A Licensed Mental Health Professional (LMHP), such as a Licensed Clinical Social Worker (LCSW), must complete the Comprehensive Needs Assessment and SAR of the recipient to help determine the eligible number of allocatable hours and eligibility. The

mental healthcare service provider submits the SAR signed by the LMHP to the MCO/Magellan for authorization. To bill Medicaid, the mental healthcare service provider must have a completed, valid Comprehensive Needs Assessment and approved SAR. Ex. 1 ¶ 8.

If the Community-Based Care Assessment, Plan of Care, Comprehensive Needs Assessment, and SAR are not made by the requisitely licensed persons, home healthcare and mental healthcare service providers are not eligible for reimbursement for those services provided to Medicaid recipients. Ex. 1 ¶ 9. To receive reimbursement for covered services as set forth in the provider manual, Medicaid providers typically submit reimbursement claims electronically, routing those claims directly to Magellan's or an MCO's website. Ex. 1 ¶ 10.

Pursuant to an agreement with DMAS, Synergy received payments from DMAS for providing personal care services, respite care services, and MHSS to Medicaid recipients. Ex. 1 ¶ 11.

B.  **Overview of the Counts**

Section 1347 (Count 1) makes it a crime to knowingly and willfully execute, or attempt to execute, a scheme or artifice (1) to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program, in connection with the delivery of or payment for healthcare benefits, items, or services. Synergy was authorized to provide home healthcare and mental healthcare services, including (1) personal care services; (2) respite care services, and; (3) mental health skill-building services to recipients of Medicaid. Guyton committed fraud by submitting, or causing to be submitted, false and fictitious Community-Based Care Assessments and Plans of Care for personal care and respite services, as well as Comprehensive Needs Assessments and Service Authorization Requests for mental health

services that were not completed by registered nurses or licensed mental health professionals, to DMAS and its contractors, eclipsing over $900,000 in fraudulent gains.

Section 1035 (Counts 2-7, 9) makes it a crime if any individual, in any matter involving a healthcare benefit program, knowingly and willfully (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for healthcare benefits, items, or services. The parties agree that this matter involved a healthcare benefit program as defined in 18 U.S.C. § 24(b). Ex. 1 ¶ 2.

Through Guyton, Synergy made stipulated claims for and received payments to/from DMAS as follows, among other claims:

| DATE OF CLAIM/PAYMENT | DATES OF SERVICE | TYPE OF SERVICE | MEDICAID RECIPIENT |
|---|---|---|---|
| 04/04/2018 | 03/26/2018-03/30/2018 | MHSS | M.R. |
| 06/13/2018 | 06/04/2018-06/08/2018 | MHSS | M.S. |
| 07/17/2018 | 07/02/2018-07/06/2018 | MHSS | M.H. |
| 04/18/2018 | 04/10/2018-04/15/2018 | RCS | M.K. |
| 04/25/2018 | 04/16/2018-04/20/2018 | MHSS | M.K. |
| 05/02/2018 | 04/23/2018-04/29/2018 | PCS | M.K. |
| 05/30/2018 | 05/21/2018-05/25/2018 | MHSS | G.D. |

Ex. 1 ¶ 12.

Regarding "willfulness," reckless disregard and plain indifference are tantamount to willfulness. The Fourth Circuit "repeatedly has held 't]hat 'reckless disregard' and 'plain indifference' can constitute criminal 'willfulness.'" *United States v. Blankenship*, 846 F.3d 663, 672 (4th Cir. 2017). "[W]hen determining the willfulness of conduct, we must determine whether the acts were committed in deliberate disregard of, or with plain indifference toward, either known legal obligations or the general unlawfulness of the actions." *Id*. at 672–73 (describing willfulness as "(1) acting without justifiable excuse; (2) acting stubbornly, obstinately, perversely; (3) acting without ground for believing it is lawful; and (4) acting with careless disregard as to whether or not one has the right so to act." (citation omitted)). "[D]efendants should not be permitted to 'escape the reach' of criminal statutes that require proof that a defendant acted knowingly or willfully 'by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances.'" *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). The Ninth Circuit in particular has also long approved the concept of reckless indifference in § 1347 prosecutions. *United States v. Dearing*, 504 F.3d 897, 902 (9th Cir. 2007).

## II.  Anticipated Testimony and Evidence

### A.  Background on Synergy and Guyton

Law enforcement and former employees will testify regarding the background on Synergy and Guyton, as well as seized Synergy patient records from September 2018, whose authenticity and admissibility are not contested. Ex. 1, Stip. 1 ¶ 1. Synergy was located in Chesapeake and Portsmouth, Virginia at various times relevant to the indictment. The defendant is the owner and CEO. Synergy opened in summer 2016 and provided home health services, which included personal care and respite care. Synergy and DMAS executed Participation Agreements in June

2016.

### B. The Fraudulent Conduct

As discussed, an LMHP (such as a LCSW) must perform an assessment and SAR before approving MHSS services for the Medicaid patient. Despite these requirements, from the middle of July 2017 through at least October 2018, Synergy did not have without a LCSW available to make these assessments or reassessments. Regardless, Guyton and Synergy submitted documents to DMAS for authorization for MHSS for well over 35 patients that contained forged signatures and authorization supposedly attested to by Jamie Bledsoe, a LCSW who worked at Synergy from October 2016 until the middle of July 2017. DMAS approved services based on these fraudulent documents, and Synergy billed and received over $740,000 from DMAS based on the fraud.

Synergy did the same for their personal care and respite services. Again, as discussed, DMAS required an RN for personal care/respite services to make assessments before approving services to the Medicaid patient, Guyton and Synergy forged signatures of an RN, specifically, Nakesia Mouzon (nee Carter), who had done a few assessments for Synergy during other time periods. DMAS approved services based on these fraudulent documents, and Synergy billed and received over $50,000 from DMAS based on the fraud.

During the same time period, Synergy billed and received from DMAS an additional $480,000 for patients for whom there was no documentation that any assessment had ever been done or billed for personal and respite care for recipients while they were in the hospital or at other care settings. In addition, Guyton and Synergy inflated the time for billing for mental health services, when compared to progress notes and witness statements. Numerous notes were for a session that lasted one or two hours, but were billed at approximately double that amount.

During the investigation, Guyton was interviewed twice by law enforcement. Investigators

showed Guyton records from her client files to discuss the deficiencies during the second interview. She admitted she handled all the insurance-related obligations for Synergy, such as enrollment and credentialing. She explained she was responsible for all policies and procedures at Synergy. She maintained the licensing, forms, and guidelines to which the company adheres. She admitted she reviewed employees' timesheets when submitted and agreed there were instances when the submitted paperwork was incorrect. Guyton claimed relevant expertise in policy and procedure, but could not adequately explain why required Medicaid forms, such as the DMAS-97s, DMAS-99s, comprehensive assessments, and SARs were filled out incorrectly or fraudulently.

By way of example and to preview the government's factual bases for the charges, one recipient's paperwork bears the authorization signature of former Synergy LCSW contractor Jamie Bledsoe; however, it is dated when she was no longer working with Synergy.

Another example involves former Synergy employee Nakeshia Mouzon (nee Carter)—a licensed RN, family nurse practitioner, and psychiatric nurse. Mouzon was active-duty in the United States Navy from July 2016 through August 2019. Guyton wanted Mouzon to conduct assessments of Synergy clients on an as-needed basis. While she was working with Synergy, Mouzon only completed a handful of assessments. Mouzon became ill in 2016 and had brain surgery on February 6, 2017 at Portsmouth Naval Hospital. She was incapacitated until May 2017. For months while she recuperated, Mouzon could not walk or drive, and she needed assistance with her own daily activities. She was later deployed to Texas from September 2017 through October 2017. However, Synergy DMAS-97s and DMAS-99s show her signature on these forms when she was in Texas or incapacitated. Mouzon confirmed the signatures on the forms were not

8

hers and were forgeries. In addition, she advised investigators she never completed any UAIs for Synergy.

Guyton has a history of misrepresentations. For example, she told investigators she provides her entire staff an annual bonus when employees interviewed stated they never received a bonus, or they only received a bonus one time as a Synergy employee, and other employees contend Guyton declined to pay them or would pay them late. Guyton also stated that qualified mental health professionals (QMHPs) are allowed an hour for "charting," and that a client may be billed for mental health services if they were hospitalized, despite Chapter IV of the Mental Health Services Manual proscribing those practices.

Further, Guyton has a lavish lifestyle involving various consumer goods, and holds herself out as a pillar of the community. She also faces, but has not responded to, a default judgment motion for fraudulently inducing a business partner to invest over $300,000 in the aggregate into an operation for a Virginia children's home. *Conyers v. Guyton*, 2:23-cv-689, ECF No. 9 (complaint) (E.D. Va. Dec. 27, 2023). Her conduct involving misrepresentations is not limited to these examples, and will be discussed more fully during trial.

### III. Bases for the Admissibility of the Government's Anticipated Evidence

#### A. Stipulations

In this case, the parties have stipulated to the authenticity of many of the records the government intends to present in its case-in-chief, *see* Fed. R. Evid. 901, and also have stipulated that those records constitute business records and thus are not excluded by the rule against hearsay, *see* Fed. R. Evid. 803(6). The records include patient files, company files, government manuals and regulatory requirements, a recording involving the defendant, an overview of the Medicaid approval process, the specific transactions concerning fraudulent statements, and bank records. *See* Ex. 1. Witnesses will not be required to authenticate records. Further, those records may

9

not be objected to as inadmissible hearsay. In addition, the government believes parties will agree to "pre-admit" a number of exhibits prior to trial so as to streamline the presentation of evidence.

### B. Regulations & Policies of Healthcare Benefit Programs

The government intends to introduce evidence of the rules, policies, and regulations of the involved healthcare benefit programs, including Medicaid and DMAS. Ex. 1. However, the presentation will be abbreviated since the parties have stipulated to much of the DMAS requirements. This limited evidence will explain the basic framework of these programs and their agreements with the defendant. Importantly, the government is not presenting the regulatory evidence for the purpose of "bootstrapping potential regulatory or ethical infractions into a criminal conviction." *United States v. Mzese,* No. WMN-13-573, 2014 WL 2804001, *2 (D. Md. June 19, 2014). Instead, it is relevant and admissible as evidence of (1) defendant's intent to defraud, an element of the healthcare fraud charges, and the knowing and willful element of the false statement charges, and (2) the materiality of defendant's false statements and misrepresentations.

Courts often permit evidence of governing regulations for the purpose of showing a defendant's intent to defraud where, as here, foundationally understanding a particular program or industry necessarily requires at least an introduction of the government regulations. *See United States v. Stefan*, 784 F.2d 1093, 1097-99 (11th Cir. 1986) (affirming admission of banking regulation violation). In such circumstances, courts have concluded that reference to the regulations are necessary to provide context to help understand the scheme to defraud. *United States v. Arthur,* No. 09-20877, 2011 WL 2749609 (5th Cir. July 15, 2011) (affirming admission of Medicare regulations in healthcare fraud case); *United States v. Munoz-Franco*, 487 F.3d 25, 65-66 (1st Cir. 2007) (affirming admission of banking regulatory violations to provide context and to establish their knowledge of the impropriety of their activities). As such, this evidence is

relevant and highly probative of the defendant's fraudulent intent. For instance, the government intends to present this evidence to demonstrate defendant's familiarity with and knowledge of services for which healthcare benefit programs would reimburse her—such as her signature on numerous documents informing her of the same—which would tend to show the intent behind her falsifications. The government does not intend to dwell on this evidence but it is probative and relevant to prove the materiality of the defendant's alleged fraud and false statements.

### C. Testimony By Certain Witnesses

Law enforcement and former Synergy employees will testify about Guyton's fraudulent conduct. This testimony will go beyond the specifically charged counts in Counts 2-7, and 9 to further support the evidence involving Guyton's overall scheme. In *United States v. Bajoghli*, 785 F.3d 957 (4th Cir. 2015), the government charged a healthcare fraud scheme where a dermatologist diagnosed patients with cancer they did not have and then performed medically unnecessary surgeries. The Fourth Circuit held it was a reversible abuse of discretion for the district court to "limi[t] the government's proof to that which is directly relevant to one or more of the 53 executions charged in the indictment, without taking into account the relevance of uncharged conduct to the alleged overarching scheme." 785 F.3d at 964. It explained that the government must have "adequate latitude to prove its case, especially in a large and complex healthcare-fraud case where the defendant's criminal intent is placed at issue." *Id*.

Evidence of conduct that is not specifically uncharged but nonetheless consistent with the scheme to defraud is intrinsic and does not fall within the scope of Rule 404(b). This is because "evidence of transactions and conduct not charged is relevant to proving the existence of and the boundaries of the conspiracy or scheme." *Id.* at 963; *see also, e.g.*, *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015) ("Our Circuit repeatedly has held that evidence of uncharged

11

conduct that is part of the same scheme or series of transactions and uses the same *modus operandi* as the charged offenses is admissible as intrinsic evidence outside the scope of Rule 404(b).").

### D. Redactions

At trial, the government plans to admit evidence that contains patients' names or Personally Identifiable Information (PII), as well as sensitive medical information, under seal. After the conclusion of the trial, the government will move to replace the sealed exhibits with redacted ones for the public record.

### E. Defendant's Earnings and Spending

The government will introduce evidence during its case-in-chief regarding the defendant's earnings and use of those earnings. This evidence, which will include both financial records and testimony by the defendant's former employees and law enforcement, will show that the defendant purchased luxury goods and needed the money from her fraud scheme to support her lavish lifestyle. Although the Fourth Circuit has made clear that this sort of evidence is not "character evidence" covered by Rule 404, *see United States v. Cole*, 631 F.3d 146, 155 (4th Cir. 2011), this evidence is both relevant and essential to proving the defendant's motive and intent behind her fraudulent billing practices. *Bajoghli*, 785 F.3d at 966-67 ("Because a violation of the healthcare fraud statute requires knowing and willful conduct, *see* 18 U.S.C. § 1347(a), the government must establish [the defendant's] intent to defraud. . . . And evidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud.").

In *Cole*, the Fourth Circuit rejected the defendant's argument that the district court erred in admitting evidence of his "lavish spending." 631 F.3d at 155. Such evidence "was clearly probative of [the defendant]'s motive (e.g., wealth accumulation and maintenance)." *Id.*; *United States v. Poole*, 451 F. App'x 298, 307 (4th Cir. 2011) ("evidence of [the defendant]'s lavish lifestyle and straitened financial circumstance went directly to motive"); *United States v.*

12

*Abdulwahab*, No. 3:10cr248, 2016 WL 234109, at *7 (E.D. Va. May 3, 2016); *United States v. Shelburne*, No. 2:06CR00023, 2008 WL 474094, at *2-3 (W.D. Va. Feb. 21, 2008 (collecting cases from various courts and holding that evidence of lavish spending could be admitted under Rules 403 and 404(b) "to demonstrate the defendant's motive-greed").

### F. Charts and Summaries under Rules 1006 and 611

Pursuant to Federal Rules of Evidence 1006 and 611, the government may present certain summary charts. Principally, the government may present summaries of the defendant's financial records, including the revenues from her business and spending of those revenues, as discussed above and (2) summaries of Guyton and Synergy's claims to DMAS.

Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. It is well-established that "[s]ummary charts are admissible if they aid the jury in ascertaining the truth." *United States v. Loayza,* 107 F.3d 257, 264 (4th Cir. 1997) (citing *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995). This rule authorizes the admission of charts into evidence that serve "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence," thereby "reduc[ing] the volume of written documents that are introduced into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). Rule 1006 further requires the proponent to "make the originals or duplicates available for examination . . . at a reasonable time and place." Fed. R. Evid.1006.

Bank records often are the subject of proffered summary charts as they typically are voluminous and do not lend themselves to easy examination in the courtroom. *See Loayza*, 107 F.3d at 264 (affirming the admission of summary charts of bank records); *United States v. Duke*s, No. 05-5266, 2007 WL 1962954,*49-51 (4th Cir. July 3, 2007) (affirming admission of summary charts of bank records).

Under Federal Rule of Evidence 611(a), summaries and charts may also be presented of evidence already in the record. *Janati*, 374 F.3d at 273. "Rule 611(a) charts are not evidence themselves; they are used 'merely to aid the jury in its understanding of the evidence that has already been admitted,' by, for example, 'reveal[ing] inferences drawn in a way that would assist the jury.'" *Id.*; *United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) (quoting *Janati*, 374 F.3d at 273). For example, the Fourth Circuit has allowed the presentation of charts of banking transactions that were presented at a criminal trial to "help the jury understand how various related records demonstrated a pattern of suspicious activity engaged in by the defendants." *Id.* It has also recognized the particular value of summary materials in healthcare fraud trials to aid the Court's understanding of a complex subject matter. *Janati*, 374 F.3d at 274.

The government will introduce some of this underlying data as evidence. The government has provided the substantive content to the defendant, and will provide the summaries or charts to defense counsel for review prior to trial. To present the testimony regarding financial data, the government intends to call a law enforcement agent to testify about the analysis of the health care claims and will seek to admit summary charts through them as evidence.

**G. Admission Under the Hearsay Rules**

The parties have stipulated that much of the documentary evidence constitutes business records. Fed. R. Evid. 803(6). However, the government previews several evidentiary issues that may arise during trial involving application of other hearsay rules.

**1. Statements of the Defendant and Her Employees (Rule 801(d)(2))**

The government will introduce many statements made by Guyton herself, such as those made to employees and law enforcement. Such statements are admission of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A) (excluding from the hearsay definition "offered against an opposing party" and "made by the party

in an individual or representative capacity"). Further, when testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "recognizable as admissions," *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

Additionally, as the owner of Synergy, the defendant employed numerous staff over the years of the charged fraud scheme. The government will seek to introduce various statements made by the defendant's employees during their employment. Whether made to the defendant, patients, or other employees, these statements are admissible under Federal Rule of Evidence 801(d)(2)(D), which excludes statements from the definition of hearsay when they are "made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed." Under this rule, "a statement offered against an opposing party, and which was made by the party's agent or employee on a matter within the scope of that relationship and while it existed is not hearsay." *United States v. McCabe*, 103 F.4th 259, 276 (4th Cir. 2024) (citation and internal quotation marks omitted) ("the court must determine whether the subject matter and circumstances of the out-of-court statement demonstrate that it was about a matter within the scope of the employment.").

### 2. Prior Consistent Statements (Rule 801(d)(1)(B))

To the extent that the defendant attacks the credibility of any of the government's witnesses, the government may seek to admit certain statements as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B). That rule provides that a statement is not hearsay if "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered . . . [either] (i) to rebut an

express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying;[2] or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."

Subpart (ii) of this rule, which refers to prior consistent statements to rebut attacks on a witness on grounds other than the fabrication or improper influence referenced in subpart (i), appears in the rule as the result of a 2014 amendment to the Federal Rules of Evidence. The addition of subpart (ii) expands the prior rule, which "did not, for example, provide for substantive admissibility of consistent statements that are probative to explain what otherwise appears to be an inconsistency in the witness's testimony," or to "rebut a charge of faulty memory." Advisory Comm. Notes to 2014 Amendments. While courts continue to interpret the reach of this provision, the Second and Fifth Circuits have recently expressly held that such "other grounds" include accusations of a witness having a faulty memory. *United States v. Portillo*, 969 F.3d 144, 176 (5th Cir. 2020); *United States v. Flores*, 945 F.3d 687, 705 (2d Cir. 2019).

In addition to these two rationales, the Fourth Circuit has held that prior consistent statements are also admissible under the so-called "doctrine of completeness" if "other portions of the same statement have been used to impeach the witness, such that 'misunderstanding or distortion can be averted only through presentation of another portion' of the statement." *United States v. Hedgepeth*, 418 F.3d 411, 422 (4th Cir. 2005) (*quoting United States v. Mohr*, 318 F.3d 613, 626 (4th Cir. 2003)).

The government appreciates that "[t]he prior consistent statements of a witness are, as a general proposition, inadmissible as substantive evidence," *Hedgepeth,* 418 F.3d at 422.

---

[2] Under 801(d)(1)(B)(i), a prior consistent statement is generally only admissible as substantive evidence "if the statement was made prior to the time the supposed motive to falsify arose." *United States v. Henderson*, 717 F.2d 135, 138 (4th Cir. 1983).

16

Accordingly, it will only seek to offer such statements as evidence if necessary (i) to rebut charges of fabrication, (ii) to respond to attacks on a witness's credibility when attacked on another ground, such as faulty memory, or (iii) to provide the Court with an accurate sense of the witness's prior statements consistent with the doctrine of completeness.

Importantly, when proving the existence of a prior consistent statement, the government may rely on extrinsic evidence. To put it another way, the government may choose to rehabilitate a witness against a charge of fabrication *either* by eliciting evidence of a prior consistent statement on redirect examination, *or* by eliciting testimony from another witness who was present when the prior consistent statement was made. Two cases from the Fourth Circuit are especially instructive on this point. In *United States v. Henderson,* 717 F.2d 138 (4th Cir. 1983), a bank robbery case, the government elicited testimony from a cooperating witness who identified the defendant as one the robbers. On cross-examination, defense counsel suggested that the witness was fabricating testimony in exchange for a plea bargain. Seeking to rehabilitate the witness, the government invoked Rule 801(d)(1)(B), *both* "by successfully refreshing [the witness's] memory [about prior consistent statements] on redirect examination" *and* by asking another witness, an FBI agent, about those same statements. *Id.* at 138. The defendant challenged the admission of the statements on appeal, but the Fourth Circuit concluded that their admission was appropriate. In doing so, it stated that that "prior consistent statements made to government officers" are, in fact, often admissible when made before plea bargains are finalized. *Id.* at 139. While the Fourth Circuit suggested that eliciting testimony about the prior consistent statement both from the declarant and from a third party might have been "cumulative," it also said that it was "not error" under Rule 801(d)(1)(B). *Id.*; *see also United States v. Dominguez,* 604 F.2d 304 (4th Cir. 1979).

17

### 3. Mental, Emotional, or Physical Condition (Rule 803(3))

Although the parties have stipulated to the authenticity and admissibility of numerous records, including patient files, in the event that additional evidentiary support is needed, the United States briefly addresses certain additional Rules of Evidence.

Under Federal Rule of Evidence 803(3), the general rule against hearsay does not include "[a] statement of the declarant's then-existing state of mind (such as motive, intent or plan), or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." This rule, however, excludes from this hearsay exception "a statement of memory or belief to prove the fact remembered or believed." *Id.* The United States may seek to admit testimony regarding past statements of the defendant's patients, whether made to the defendant, employees, or others. Such testimony is admissible under this rule so long as it reflects a generally contemporaneous expression of the patient's emotional or mental state, and physical feelings such as pain and other bodily health. *See United States v. Cardascia*, 951 F.2d 474, 488 (2d Cir. 1991) (statement must be "part of a continuous mental process"); *see also United States v. Hanna*, 353 F. App'x 806, 809 (4th Cir. 2009) (holding admissible under this rule regarding a friend's statements regarding a victim's expressions of "general fear and distress").

### 4. Statement Made for Medical Diagnosis or Treatment (Rule 803(4))

Patients' statements to the defendant, employees, and perhaps others will also be admissible under Rule 803(4) of the Federal Rules of Evidence, which allows the admission of a hearsay statement that is "made for – and is reasonably pertinent to – medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." The admissibility of a statement pursuant to this rule is governed by a two-part test: "(1) the declarant's motive in making the statement must be consistent

18

with the purposes of promoting treatment; and, (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988) (quotation and footnote omitted). "This exception to the hearsay rule is premised on the notion that a declarant seeking treatment 'has a selfish motive to be truthful' because 'the effectiveness of medical treatment depends upon the accuracy of the information provided.'" *Willingham v. Crooke*, 412 F.3d 553, 561-62 (4th Cir. 2005).

The scope of this hearsay exception is not limited to statements made directly to physicians. *See, e.g.*, *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984) (referencing "statements made to a nurse or doctor concerning medical history, treatment, and diagnosis"). Instead, a statement "made to a hospital attendant, ambulance driver, or member of the family may qualify if intended by the patient to secure treatment." McCormick on Evidence § 277, *The Hearsay Rule and Its Exceptions* (8th ed.) (Apr. 13, 2020). Nor must the statement in question be one made by the patient, so long as the statement meets the rule's criteria. *See Danaipour v. McLarey*, 386 F.3d 289, 297-98 (1st Cir. 2004).

**H.  Criminal History for Witness Impeachment (Rule 609)**

Only one government witness has prior criminal convictions, and they are older than ten years. The admissibility of such convictions to impeach credibility is governed by Federal Rule of Evidence 609. For any convictions that are older than ten years, regardless of the specific nature of the conviction, evidence of a conviction is admissible only: (a) after fair, written notice by the defense; and (b) if the probative value of the conviction, "supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect." Fed. R. Evid. 609(b) (emphasis added). The party seeking admission "bears the burden of establishing specific, or articulated, facts and circumstances that support" the requisite finding. *United States v. Beahm*, 664 F.2d 414, 418 (4th Cir. 1981). Such aged convictions should be admitted only "very rarely and only in

19

exceptional circumstances." *Id.* at 417 (quotation omitted). This particular witness has a conviction for contempt of court from 2011 in the Commonwealth of Virginia. The defense has not notified the government of an intention to use the criminal history. Barring substantial weight compared to a prejudicial effect, there is no basis to present evidence of a contempt-of-court conviction.

        Respectfully submitted,

        Jessica D. Aber
        United States Attorney

By:   /s/
      Clayton D. LaForge (Va. Bar No. 84075)
      Elizabeth Yusi (Va. Bar No. 91982)
      Assistant United States Attorneys
      United States Attorney's Office
      101 West Main Street, Suite 8000
      Norfolk, VA 23510
      Office Number: 757-441-6331
      Facsimile Number: 757-441-6689
      Email: clayton.laforge@usdoj.gov