IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 2:23-cr-35 |
| WHITTENEY GUYTON, | |
| Defendant. | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Indictment and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt with admissible, credible evidence:

1. Virginia Medicaid is a state and federally funded health care program providing benefits to eligible low-income adults, children, pregnant women, elderly adults and people with disabilities. Upon enrollment in Virginia Medicaid, providers are required to sign an enrollment contract agreeing to terms and conduct required by Medicaid of its providers.

2. Under Medicaid contract, a provider agrees to ensure the individuals providing direct care to clients are properly qualified, licensed and credentialed.

3. At all material times, WHITTENEY GUYTON owned and operated Synergy Health Systems LLC ("Synergy"), a business located in Chesapeake, Virginia and Portsmouth, Virginia, that was authorized to provide home health care and mental health care services, including (1) personal care services (PCS), (2) respite care services (RCS), and (3) mental health skill-building services (MHSS) to recipients of Medicaid, a health care program for indigent persons that is jointly funded by federal and state governments.

1

4.      Home health care service providers such as Synergy must obtain prior authorization from Medicaid before providing services to Medicaid recipients. Medicaid, through its contractor Keystone Peer Review Organization (KePRO), reviews authorization requests for PCS and RCS to ensure, among other things, that the services are medically necessary and allowable under applicable Medicaid regulations.

5.      PCS, as authorized by applicable Medicaid regulations, are those long-term maintenance and support services that are necessary to enable eligible Medicaid beneficiaries to remain at or return to home rather than enter a nursing facility.

6.      RCS, as authorized by applicable Medicaid regulations, are designed to provide temporary, substitute care for a Medicaid recipient that is normally provided by the family or another unpaid primary caregiver of the recipient. These services are provided on a short-term basis because of the emergency absence, or the need for routine or periodic relief of the primary caregiver.

7.      For a home health care service provider to be eligible for reimbursement for PCS and RCS, the provider must receive a copy of a valid Long-term Services and Supports (LTSS) Screening, inclusive of the Uniform Assessment Instrument (UAI) for the Medicaid recipient. The Screening is obtained from an authorized screening team such as the local Department of Social Services or an acute care hospital. UAIs must be completed by a qualified accessor. A Registered Nurse (RN) must also make a Community-Based Care Assessment and a Plan of Care of the recipient to determine the eligible number of PCS hours and respite care eligibility. The home health care service provider then submits the Screening, including the UAI, assessment, and Plan of Care to KePRO or the appropriate Commonwealth Coordinated Care Plus (CCC Plus) managed care organization (MCO) for review and authorization. The home health care

service provider must receive approval from KePRO or the MCO before they can be paid for PCS and RCS provided to Medicaid recipients

8. MHSS are goal-directed training and supports to enable restoration of an individual to the highest level of baseline functioning while achieving and maintaining community stability and independence in the most appropriate, least restrictive environment. MHSS offer an array of intensive skills training and supports for individuals experiencing functional limitations as a result of severe and persistent mental illnesses.

9. Magellan of Virginia is the behavioral health services administrator (BHSA) for the Department of Medical Assistance Services (DMAS). They review authorizations for MHSS for individuals with Medicaid that are not enrolled in managed care. Additionally, the MCOs who are contracted under CCC Plus and the Medallion 4.0 program also review authorizations for MHSS for individuals enrolled in Medicaid managed care. Medicaid, through its contractors, reviews authorization requests for MHSS to ensure, among other things, that the services are medically necessary and allowable under applicable Medicaid regulations.

10. For a mental health care service provider to be eligible for reimbursement for MHSS, the provider must complete a Comprehensive Needs Assessment to gather the clinical data and diagnosis to ensure the recipient meets the medical necessity criteria for the service. A Service Authorization Request (SAR) is completed after the Comprehensive Needs Assessment because it is based on the information collected in the assessment. A Licensed Mental Health Provider (LMHP) or LMHP resident/supervisee must complete the Comprehensive Needs Assessment and SAR of the recipient to determine the eligible number of MHSS hours and eligibility. The mental health care service provider submits the SAR signed by the LMHP or LMHP resident/supervisee to the MCO/Magellan BHSA for authorization review and approval.

In order to bill Medicaid for MHSS services other than the assessment, the mental health care service provider must have a completed Comprehensive Needs Assessment and approved SAR.

11. If the Community-Based Care Assessment, Plan of Care, Comprehensive Needs Assessment, and SAR are not made by the requisitely licensed persons, home health care and mental health care providers are not eligible for reimbursement for those services provided to Medicaid recipients.

12. Pursuant to an agreement with the Virginia Department of Medical Assistance Services, ~~GUYTON~~ Synergy received payments from DMAS for providing PCS, RCS, and MHSS to Medicaid recipients.

13. During the period from in or about June 2016 through in or about October 2018, in the Eastern District of Virginia, WHITTENEY GUYTON, the defendant, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud the Department of Medical Assistance Services, a health care benefit program as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money owned by and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services, which scheme and artifice, and the execution thereof, were in substance as follows:

14. Specifically, GUYTON and Synergy submitted and caused to be submitted to DMAS false, fraudulent, and fictitious claims to DMAS and its contractors for services provided to Medicaid recipients based on the fraudulent Community-Based Care Assessments, Plans of Care, Comprehensive Needs Assessment, and SARs. Each of these claims were part of a health care fraud scheme and also constituted false statements regarding health care matters.

4

15. Prior to October 2018, GUYTON utilized RN1 to conduct assessments for Synergy. However, GUYTON forged and caused to be forged RN1's signature after RN1 stopped working for her. Upon interview, RN1 identified numerous assessments containing her signature from January 2017 to April 2017 that could not have been completed due to incapacity after brain surgery. RN1 further identified deployment periods from September 2017 through October 2017 and October 9, 2018, through December 21, 2018 where she could not have completed assessments. As such, Synergy should not have billed for or received compensation for providing services to these beneficiaries since they never had an assessment by a RN. However, Synergy did fraudulently bill for these services and received money from Medicaid for the services.

16. GUYTON committed the same type of forgeries using LCSW1's information. After LCSW1 completed some legitimate assessments, GUYTON continued to utilize LCSW1's signature in order to fraudulently bill Medicaid. The LCSW worked for Synergy September 2016 through June 2017. The LCSW provided notice of her resignation on July 12, 2017. The LCSW reviewed assessments allegedly containing her signature, and confirmed that the assessments were forged and she never performed them.

17. Medicaid received these forgeries from Synergy and authorized at least $353,423 from August 2016 through August 2018 for claims that would not have been paid for without the forged assessments. In addition to the forgeries, there was missing/incomplete documentation regarding comprehensive needs assessments, recipient files, community-based care assessments, and plans of care. An additional $966,665 is attributed to these incomplete claims.

18. For example, on or about April 4, 2018, GUYTON and Synergy fraudulently billed for MHSS for patient M.R. However, M.R.'s SAR and was forged and fraudulent. The same occurred with patients M.S., M.H. and M.K.

19. Another example, on or about May 2, 2018, GUYTON and Synergy fraudulently billed for PCS for patient M.K. However, M.K.'s assessment and plan of care was forged and fraudulent.

20. Law enforcement interviewed current and former employees at Synergy. According to them, GUYTON directed everything that occurred at Synergy, including the fraudulent documentation for assessments, SARs, and billings, along with providing fake notes and records to support the billings.

21. FE1 worked for Synergy as a QMHP through 2017. FE1 relayed that their paychecks would be held if they did not submit paperwork for client they were assigned. FE1 admitted being pressured to provide notes documenting services that were not rendered by GUYTON. Paperwork was completed and submitted electronically. FE1 also fielded complaints from clients who complained about not receiving services.

22. As a result of GUYTON's schemes, she obtained approximately $1,320,088 to which she was not entitled.

23. The acts taken by the defendant, WHITTENEY GUYTON, in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law and were not committed by mistake, accident, or other innocent reason.

24. The defendant acknowledges that the foregoing Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the government. It does

not describe all of the defendant's conduct relating to the offenses charged in this case, does not identify all of the persons with whom the defendant may have engaged in illegal activities, and is not intended to be a full enumeration of all the facts surrounding the defendant's case.

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Elizabeth M. Yusi
Assistant United States Attorney

*United States v. WHITTENEY GUYTON*, 2:23cr35

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the plea agreement entered into this day between myself, the United States and my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Whitteney Guyton
Defendant

<u>Defense Counsel's Signature:</u> I am the attorney for defendant WHITTENEY GUYTON. I have carefully reviewed the above Statement of Facts with them. To the best of my knowledge, their decision to stipulate to these facts is an informed and voluntary one.

_____
James Q. Broccoletti
Counsel for Defendant